Synopsys v. Risk Based Security, Inc. Mr. Samuels, we'll hear from you. May it please the court, this case is moot. Synopsys said in its complaint that its trade secret claims were about whether RBS had trade secrets in its VONDB database and whether Synopsys misappropriated those trade secrets in its role as a CNA. That's that public non-commercial rule we've been talking about. RBS then gave Synopsys a covenant not to sue that covered any and all existing or future claims based on Synopsys' role as a CNA related to VONDB. So all the trade secret allegations in the complaint are covered by the covenant not to sue. Any other trade secret issues between the parties belonging in Massachusetts State Court in this case never should have reached summary judgment. Was that covenant unconditional and irrevocable? It was unconditional and irrevocable. It says at JA 581 that it's meant to conclusively resolve the litigation. That again, it applies to any and all existing or future claims and so it is unconditional and irrevocable. How does that language make it irrevocable again? Because it's conclusively ending the litigation. If you're conclusively ending the litigation, then you can't revoke it. Your friend on the other side I think said it's based on a characterization of their position that's not correct. A couple issues with that. One, it's based on what the other side calls a characterization of a position that's not correct is actually just a defined term. So we go through some whereas clauses and we identify by ECF number things that the other side said. And then there's a defined term that calls in these non-use representations. I think that's what your honor is asking about. And then we reference those representations again and then we get to the actual covenant not to sue language which says this applies to any and all existing or future claims. But what they're really taking issue with is a defined term that we use to capture things that we cited specifically by docket number in the covenant not to sue. The other issue with their position is, as I just mentioned, what we're talking about are whereas clauses in a covenant not to sue. I think there would be a lot of transactional lawyers who would be surprised to hear that a whereas clause is now a condition or some method of revoking a written document. These are whereas clauses setting up the context and background of the covenant not to sue. But your covenant not to sue is dependent on the existence of the whereas clauses. It's not dependent on the existence of the whereas clauses. The whereas clauses set up the factual context in which the covenant arises. Well, I mean, it's based on the factual context and you're not releasing things that are not in that factual context, are you? Well, the things that we are releasing and the things that are clearly within the factual context are everything in the complaint, everything in the complaint. Synopsis has had several chances in the district court and in this court to try and explain what is it that this covenant doesn't cover. And by the way, even when Synopsis is calling the covenant conditional and revocable, when they try to explain why, they come up with only one example of what this covenant they say doesn't cover. And it's this idea of these associated BDSA records that we're talking about in the briefs. And so the idea there is that even though this case is about Synopsis' role as a CNA, which is that public disclosure role, you're disclosing software vulnerability information to the public, Synopsis says, well, after we disclose it to the public as a CNA, we make a note of it in this BDSA product, this private, commercial, subscribers-only product. We make a note of it there. By the way, they make a note in BDSA of other vulnerability information, too. That doesn't come from them. The Synopsis CNA stuff is just the house brand, but they say we make a note of this in BDSA. What about the declarations that are in the complaint that say they ask for a finding that Synopsis does not infringe any copyright held by RBS, has not copied or misappropriated any of RBS's intellectual property, has not violated federal or Virginia law, and has not tortiously interfered with any contract or business expectancy under Virginia law? Those aren't limited to the CNA. What they are limited to or what they're limited by is the factual allegations in the complaint that precede them. And those factual allegations are all about CNA. JA 48 has a great example of this. If we look at paragraphs 53 and 54, paragraph 53 – actually, I'll read it along here. I have it. I won't read word for word. But paragraph 53, for example, on JA 48 talks about how, according to Synopsis, RBS claims to be the owner of trade secrets contained in its VolnDB database. And so this paragraph is all about trade secrets and VolnDB. That's paragraph 53 on JA 48. And then paragraph 54 goes on to define what Synopsis believes is the case in controversy. And Synopsis says that it's whether Synopsis's conduct as a CNA – and then there's a long parenthetical explaining what that conduct is – constitutes trade secret misappropriation. And then Synopsis says CNA a few more times in that same paragraph. It says Synopsis has agreed to fulfill the duties of a CNA. Synopsis faces harm if RBS keeps saying that Synopsis's actions as a CNA would misappropriate trade secrets. And so that's an example of where Synopsis defined the case in terms of this CNA activity. And so that defines the scope of the case. And the request for relief can't be any broader than that. That's the Clark case and all the other circuit court authority that we cited in our brief. So that's why the covenant not to sue applies. And that's why this case never should have even reached summary judgment. Any trade secret issues belong in Massachusetts State Court at this point. But when the case did reach summary judgment, the district court should not have thrown out 75 out of 75 trade secrets as a matter of law. Especially not on a fact-intensive issue like trade secret eligibility. Especially not on a fact-intensive sub-issue like reasonable efforts to maintain secrecy. Based on just two NDAs out of hundreds of other NDAs and other secrecy measures. And especially not on a fact-intensive sub-issue like independent economic value. In this declaratory judgment case where RBS did not need to specify the amount of the value of any particular trade secret. The district court also abused its discretion in excluding nearly all of RBS's experts. So what's your best evidence on the independent value of trade secrets? Some of the best evidence is what we highlighted the most in the briefing. We do have the RBS acquisition price. We've got expert testimony on value. We've got also, by the way, just the face of the documents themselves. What's the expert testimony on specific trade secrets? The expert testifies about groups of trade secrets. And grouping makes a lot of sense here, by the way. First of all, it's permitted by law as we pointed out in the briefing. And synopsis doesn't have anything that says it's not permitted by law. But second, in this case, trade secrets are naturally going to be grouped. So tell us exactly where we're going to find this grouping testimony. Sure. It would be the Adam Shostak report, which is at JA5861. Is this part of Mr. Shostak's testimony that was permitted or excluded? Our position is that it is permitted. What the district court held was that even though Mr. Shostak cannot testify as to conclusions about whether the elements of a trade secret were met, right, he can't say the independent economic value element is met. But what he can do, what the district court expressly said he could do, is he can testify about things like background of the software vulnerability industry, how people find vulnerability information. That testimony, even if all the other stuff were still excluded, which it shouldn't have been, that testimony would support a finding of independent economic value. So where would we find testimony in the record that hypothetical trade secrets 1 through 10 have a specific value, here's how we arrive at that value? If the question, if here's how we arrived at that value is looking for a particular number, we don't have a particular number, but we don't need a particular number because independent economic value means competitive advantage. But if we're looking for competitive advantage, we've got... What I'm looking for is a specific chunk of, even assuming you don't have to go trade secret by trade secret, let's say you have a specific group, you identify the group, where's the evidence that that group has a value and how do you get to that value? Great examples of that evidence would be in our opening brief when we walk through some example trade secrets and many of those are grouped. And there we've got all kinds of citations to the record about those particular trade secrets. Give us just one very specific one. Sure, one specific one would be the trade secrets in files that Synopsys saved with file names that say high value in them. And by the way, that's not just some superficial statement of high value. That is, if you look at the document where Synopsys explains what high value is, and by the way, that's JA4359, at that document, Synopsys defines what they think high value means and it actually very closely mirrors the legal definition of a trade secret under federal and Virginia law. They say this is about important software vulnerabilities affecting software products that a lot of our customers use and there's not a lot of information about this stuff elsewhere. Mr. Samuels, I think the question is begging though, you had the burden of proof at summary judgment to rebut the allegation that you have no evidence on value. What I'm trying to hear you tell me is where in the record do you answer that question? You've said you've grouped it, but you've yet to tell me where you grouped it and what value you placed on the grouping. Where do we find that information? That would be, Your Honor, where I would look to our opening brief when we go through those groups of trade secrets and we cite the evidence in the record supporting each of those trade secrets where we describe, for example, Synopsys' own identification of these trade secrets as high value. We agree, by the way, of course, that it was our burden to rebut their position that we have no evidence. But let's also clarify what their position that we have no evidence was in the district court. In the district court, in Synopsys' opening summary judgment brief, their position was the trade secrets are generally known and therefore they have no value for not being generally known. In other words, they didn't have an independent argument about independent economic value. Yeah, but doesn't that go to the second problem in your case, which is you didn't keep this information confidential? Those are unrelated concepts, actually. So not generally known or readily ascertainable is one concept, and reasonable efforts to maintain secrecy is a different concept, a different element of a trade secret. But wasn't – I thought your response in front of the district court, your response to their argument was that we know the trade secrets have value because the database is the majority of the value of the company, right? And the company was sold for a significant price. But that was the only argument to the district court about how we know the trade secrets have value. That was the primary argument to the district court. Under Rule 56, the district court had to consider all cited evidence. There's no limitation on where that cited evidence has to be. We gave examples of our response to Synopsys' factual statement. That's right up front. Where did you tell the district court specifically, here's trade secrets 1 through 10, here's their value, and here's why they have value? We did that in a couple of places. We did that in our opposition to summary judgment in the places that I mentioned, relying on our expert testimony, talking about the acquisition price, talking about the contents of the documents and what Synopsys did with them. We also did that in our opening summary judgment brief, which also should be considered because we're dealing with cross motions. In our opening summary judgment brief, we went through each of those – many of those groups of trade secrets as well. You don't need to do it right now, but what might be helpful when you come up for rebuttal is to give us some specific pages. Sure, happy to do that. Just to be clear, even just based on what we're saying right now, what we identified as evidence of independent economic value is completely consistent with other case law within this circuit. In the Trandy's case, for example, out of this court, one of the trade secrets was object code in a software program. The software code had multiple trade secrets in it. Another one was source code, for example, but one of the particular trade secrets was object code. After a trial, and then the Fourth Circuit affirmed the jury's verdict on this, the court found that this object code had independent economic value because the trade secret owner used it in its business. It provided software services. It used the entire software. It was one of the things that the trade secret owner used in its business, and the trade secret owner made a lot of money from that business, and that object code could be used to provide similar services. What this court didn't say is, where's the specific value of just the object code? You're telling me about all this money you made providing these services in part with this program, which in part includes this object code, but it was still enough to find independent economic value. By the way, the district court almost agreed with us on this. The district court almost got there. It acknowledged this Trandy's case. It acknowledged that we make most of our money from a specific service, a specific product, and then where the district court went wrong is it said, you have to show that a single trade secret could be used to create your whole business, and that's not right. Like the Pincherra case says, trade secrets can be parts of a larger system. Thank you. All right. Thank you very much. We'll now hear an argument from Ms. Stetson. Good morning, Your Honors, and may it please the court. My name is Kate Stetson. I represent Synopsys. I'd like to start, Judge Rushing and Judge Agee, where the two of you started with the questions on mootness, because the mootness issue can be resolved one of three ways. The covenant that purported to be given to Synopsys was revocable, it was conditional, and it was also partial. So for RBS to prevail on its mootness argument, it has to establish that all three of those are wrong. And in answer to your first question, I think, Judge Rushing, what Mr. Samuel said was that it's unconditional and irrevocable because it says something about conclusively resolving the litigation. The way that you make a covenant unconditional and irrevocable is by saying, as Nike did in the already case, I hereby unconditionally and irrevocably covenant not to sue you, now or in the future, for the instances of misappropriation that I alleged in my letter. They never said that. They never said that now, and they never said that below. So the fact that this was a revocable covenant should be enough to solve the mootness problem. You could stop there. It was also conditional, and that, I think, Judge Agee, was your question. This condition, such as it was, was dependent on that series of whereas clauses. And as we explain in our brief, one of the conditions was, based on this particular so-called non-use representation, which was a term that RBS defined, they covenanted not to sue us for certain behavior. That, as we also say in our brief, one of the concerns there is that RBS has done this before. In the Massachusetts case, there was an accusation in late 2017 about misappropriation of confidential information. Synopsis's employees represented in a series of declarations that the information had not been misappropriated, and RBS said, okay, in reliance on those declarations, we won't sue you. That lasted, you know, not too much longer, I think, than this Court will sit this morning, because a series of days or months later, synopsis was found, or Black Duck was found, to be the subject of an action based exactly on those so-called confidential information. So the fact that you have a revocable conditional covenant, you could stop there. It was also partial for the reasons that you also discussed with Mr. Samuels. The issue in this case, under the cease and desist letter itself, the issue in this case involved purported misappropriation of trade secrets. It didn't say because of your role as a CNA, there were two separate cease and desist demands. One of them was cease and desist misappropriating our so-called trade secrets. The second was don't do that in your role as a CNA. So the covenant not to sue that we got, of course, was directed just to the role of the CNA and just to the VolnaDB database. So it was partial. It's also partial because the purchaser of this particular company wasn't a party to that particular covenant not to sue either. So all three of those things that we've now covered, conditional, revocable, partial, mean that this case isn't moot. So turning to the merits, and I'd like to start, Judge Dawson, with your question about what this record shows because I think what Mr. Samuels said at the beginning of his merits discussion was that the issue of independent economic value is a fact-intensive sub-issue in the case. The only reason that that issue becomes fact-intensive is if you have the facts in the record to make it a factual issue. And one of the problems that the district judge identified in this case, and again, these are two different grounds for summary judgment we're talking about, independent economic value and the failure to take reasonable efforts to maintain secrecy. Independent economic value was argued below to be shown by, Judge Rushing, your question, the purchase price of the company. And the idea that the district judge should have gone through what you all see now is a formidable record. Searching for other hints of value is something that is not supported by the cases. I would urge you actually to look at the cases that Mr. Samuels cites for this proposition. What about the expert testimony or the expert reports, I suppose? If we think hypothetically that the district court took a perhaps overly restrictive view of value and for that reason struck part of the expert report because the expert didn't individually value the trade secrets, would that change the result on the valuation? So in other words, if the district court excluded part of the expert's testimony about valuation, should that cause us to doubt the conclusion of granting summary judgment in your favor on that issue, or does it not make a difference? I don't think it makes a difference, Judge Rushing. I think that there's a couple different strands of the valuation question. The reason the district judge concluded that there wasn't independent economic value shown is because, as Mr. Samuels argued today, the company was purchased in January of 2022 for a lot of money, QED. And what the district judge concluded was that you can't, I believe the word he used was perform some sort of illiterative process to conclude that the purchase price represents the value of Volna DB, which represents the value of some, but not all, of course, of the trade secrets alleged to be held within Volna DB. So you're already talking about this strangely tertiary valuation analysis that the RBS was asking the district judge to do. The question of the expert, though, with respect to Mr. Shostak, and I think that was the expert, of course, that the testimony wasn't completely excluded, as was the case with Kirsch. But with Shostak, Shostak specifically said, I am not analyzing these trade secrets separately. That's the other person. But with respect to these groups, here are certain concepts that I find. But, you know, when you have a trade secret... I've asked opposing counsel several times, and I'll ask you, is there evidence in the record from Shostak or somebody else, some other expert, that gives an explanation of trade secrets 1 through 10, this is why they have value, this is how I'll rob their specific value as opposed to any other asset? No, there's not. And the reason that Mr. Samuels identified two times in response to two of your questions, the opening brief in this case, I think, tells you a great deal. This is a case that is, you know, in response to the questions about where the evidence is, this is a fundamental failure of evidence. And the fact that Mr. Samuels is pointing to the opening brief here, the opening summary judgment brief below, all the lawyer arguments, I think, tells you everything you need to know. I would encourage Mr. Samuels on rebuttal to look for and give you specific sites to specific value of specific trade secrets, because I'm confident that the sites to the record evidence do not exist to support that. And with respect to the second independent round... Before you go to your second one, let me just ask you one more question then about this independent economic value. It's not your position today that the trade secrets didn't have value. Is it your position, though, that they didn't provide evidence in the record to support what that value was? I think I'd actually pause on that first part of the question. I think you could argue, given the timing of the purchase of the company in January of 2022, when this litigation was at full sprint, when there was already summary judgment motions pending, and challenging whether these were even trade secrets at all, the fact that this company was purchased suggests that maybe these so-called trade secrets weren't the reason for the purchase at all. It was simply something that wasn't a trade secret. In order for a trade secret to have that independent economic value, we keep shorthanding it, but it needs to be independent economic value from the trade secrets being actually kept secret. I think the fact that this company was purchased without any kind of caveat or proviso about the fact that there was ongoing litigation, it was purchased at a time when all of these trade secrets were under serious challenge. When I asked Mr. Sandwich, he said that the two issues don't really connect with each other. The whole secrecy component relative to value, what's your position to that? You're about to start talking about the second component. Are they connected or not? They are connected. The reason that you look for independent economic value isn't just to say, does this particular document held by a company have some value? Does this particular arrangement of customer data have some value? You ask whether it has value from being kept secret. That's the Buffet's versus Klinky case that I think we both cite in our briefs. If it's not value from being kept secret, then it's not a trade secret under that particular prong of the trade secret test. The other independent prong of the trade secret test is, did this particular plaintiff, in this case, even though RBS is a declaratory judgment defendant, it was reformed as a plaintiff, does that plaintiff show a genuine issue of material fact that there were reasonable efforts taken to maintain secrecy? Again, when Synopsys put forward multiple agreements, not just two, but four agreements, covering the time period that we're talking about, by the way, from 2012 through 2019, the time period at issue here is in the 2014 to mid-2017 range. Those agreements show, beyond serious cavil, that the information that RBS now says, in 2018, 2022, 2023, should have been kept confidential, wasn't kept confidential. And all of those agreements were met with an assertion that... They did have some confidentiality provisions in them, but the holes in them, I think, are much more remarkable, because those provisions didn't extend, for example, to the use of VolneDB during the time of the license. They didn't extend to an end user. The end user was not required to maintain confidentiality of VolneDB's information in the reseller agreement itself. Does that conclusively show, as a matter of law, that it would not have been reasonable for the owner of the trade secret to think that they had acted sufficiently to keep them secret? I guess the bottom line question is, why is that not a jury question? I think it's not a jury question, Your Honor, because when the district judge looked at what evidence had been mustered at this summary judgment stage, what he saw were a few agreements that were later in time, I want to say September 2018, October 2018, and one from 2019, that had confidentiality provisions. But what the judge also saw was a series of agreements covering this time period, the relevant time period, that had these holes in them, these end user confidentiality lapses. And not just the agreements, by the way. But I think unrebutted is the fact that there were demonstrations that were done of this product. There were conferences at which the founders of RBS spoke about certain sources and data that they used in order to compile their methods of securing or of viewing insecurities within code. There were all sorts of early stage tryout periods, 30-day tryout periods, that were completely devoid of any confidentiality provisions attached to them. And again, the idea that said some later time, not relevant to this case, RBS came into the knowledge, perhaps because it came into commercializing this product, that maybe it should keep its information more confidential, is a little bit beside the point. So the time period that we're concerned with, the evidence that was put forward, was simply not sufficient to generate a genuine issue of material fact as to reasonable efforts to keep something secret. And secrecy is a strange thing when you talk about a genuine issue of material fact, whether summary judgment should have been granted. Because once these things are out of the barn, once IBM has all of the VolmDB's trade secrets, once the other two companies that I think are still under seal have access to, and their end users have access to, all of VolmDB's trade secrets, once the reseller agreement in this case permits Black Duck to assign its rights and to give away to its customers the trade secrets of VolmDB, that's the end of the inquiry. The fact that there were other confidentiality agreements that purported to keep something confidential is a little bit beside the point. If there are any questions on the admission or the exclusion of the expert testimony, I'd be happy to answer them or any other questions that the Court has on mootness or on the two independent grounds for summary judgment. Thank you very much. Thank you, Your Honor. All right. Mr. Samuels, you have some rebuttal time. Thank you, Your Honor. A few more sites on independent economic value record sites. JA3975 is one. It's RBS's 30B6 witness testifying that the purchase price of RBS included the purchase price of the trade secrets. Also, again, the expert reports, for example, at JA5887-5890. I'm, again, going to cite a summary judgment brief, not because I'm citing to attorney argument, but because I'm using it as a shorthand for all the evidence cited within it. That'd be ECF 341 at pages 25 and 26, where we walk through value as well. I'd like to revisit the mootness issue. Synopsis said there were three different arguments about why they believe this case is not moot. It all comes down to one argument. It comes down to whether these associated BDSA records are within the scope of the complaint. And they're not. And Synopsis didn't even try to cite the complaint. They cited our cease and desist letter, which is not a pleading. And our cease and desist letter, by the way, said you're threatening to release this information as a CNA. And then it says, by the way, if you release this information as a CNA, it would give rise to all these claims. And so it's the release of information, which is what a CNA does. It publicly releases information. But, again, that letter is not even actually part of the complaint. And to be clear, we talked a little bit about the already case on mootness. Already doesn't require any magic words for mootness. It doesn't require the word unconditional. It requires that you end any reasonable expectation of suit. And what Synopsis said to attempt to rebut that was to say, well, several years ago in Massachusetts, the parties had a dispute. And then they resolved it by amending the reseller agreement. And then RBS sued again. Well, that's not even a legally sufficient basis to avoid mootness. The already case says once bitten, twice shy is not a way to avoid mootness.  And in that case, the amended reseller agreement that ended the party's dispute at the time included a page's worth of audit provisions because we weren't sure that they were going to keep complying with their obligations. So it was nothing like this case. So that's mootness. On independent economic value, I want to clarify one thing, which is the element of a trade secret that we're talking about here is independent economic value from not being generally known or readily ascertainable. And that is distinct from reasonable efforts to maintain secrecy. And the district court found a factual dispute about whether these trade secrets were or were not generally known or readily ascertainable. Then it decided as a matter of law that all 75 of these trade secrets had zero value from not being generally known or readily ascertainable. And I, too, would encourage the court to look back at the case law cited in these briefs on independent economic value, in particular the microstrategy case, that synopsis cited all over the place to the district court and did here as well, and the case that the district court relied on in granting summary judgment. Microstrategy, first I should mention, was an opinion after a bench trial, which again goes to show how fact-specific these issues are, like independent economic value. But then even after a bench trial, the court went back through all the trade secrets, and here are the types of findings it made about the independent economic value of the trade secrets. There was a technical document that was one of the trade secrets, and the district court said the independent economic value of this document is obvious, because it would be hard to recreate on your own. Obvious. And then elsewhere in that opinion, the district court in microstrategy says the independent economic value of a business strategy document is clear, because if it got out, you could use it to compete against the trade secret holder. That's what we're getting at with independent economic value, not these particularized showings. What we're getting at is a competitive advantage, and would the information lose value if it got out? And by the way, Chemura is another case that shows an example of this. Chemura determines independent economic value on the face of the trade secret document. Actually not determines independent economic value, but finds a factual dispute of value just based on the face of the document. And so that's what independent economic value is about. As far as reasonable efforts to maintain secrecy, we got into a discussion there on the other side about purported holes in the agreement and what we think this agreement or that agreement means. That's not a summary judgment argument, and it's a factual issue. Again, Synopsys reiterated this idea. They say it in the brief, too. They go, well, the horse is out of the barn. Another problem with their secrecy position is that they don't tell us where the horse is. They don't have evidence of us actually disclosing those trade secrets. So I'll leave with that. And again, just to reiterate on independent economic value, I gave you those sites, but I want to be clear. You'll see in those sites that Mr. Shostak grouped RBS's trade secrets and analyzed their value in groups. Thank you. Thank you very much. We'll come down and greet counsel and then take a very short recess.
judges: G. Steven Agee, Allison J. Rushing, Joseph Dawson III